All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Thank you. Be seated. Good morning, everyone. The first argued case this morning is number 2011-1362, NSK Corporation against the United States International Trade Commission. Let's see, Mr. Reynolds. Thank you, Your Honor. May it please the court, my name is Neil Reynolds and I represent the commission in this appeal. I'll be doing the opening presentation by appellants. Mr. Stewart has reserved three minutes for rebuttal. I'd like to reserve a minute for rebuttal as well. Thank you. As you know from the briefs, Your Honors, this case has had a long and complicated procedural history. But in the commission's view, it presents this court with a straightforward issue. Did the commission provide substantial evidence for its affirmative sunset review findings for the ball bearings from UK and Japan? And in our view, we think that it presents an equally straightforward answer. Yes, the commission did. Certainly, after the commission has provided more than 180 pages... Well, the threshold question for us, is it right whether or not it's substantial evidence or abusive? That's exactly right. In terms of our review. So that in and of itself is a pretty complex question before we start getting into the records. So would you like me to start on that one, Your Honor? I think that the answer, as you know from our briefs and from my co-counsel's brief, we think that the answer is actually fairly straightforward too as well. I mean, there are difficult issues in terms of what the court was saying to us. Well, there's no real case that's exactly on point here, right? Nippon is as close as it gets to you, but there's still distinctions that still goes a step farther than Nippon, right? Well, in the sense that... A little more ambiguous. A little more ambiguous in the sense that in Nippon, the first step of the two-option remand instruction was that the court of international trade told us, enter a negative determination or reopen the record to get additional information to support your affirmative. But effectively here, Your Honor, the legal effect of the court's instructions are the same. In its decisions in NSK-4 and NSK-5, the court was pretty clear, it was really unambiguous that it said it believed... Well, there's a difference between unambiguous and pretty clear. There's quite a big difference between the two. Your Honor, I'll stick with unambiguous and explicit, which is because that's better. I think the court's language made it very clear that it believed, after the two remands and the original determination, specifically stated in NSK-4 and NSK-5 for our findings for UK and Japan, that it did not believe, quote, that the existing record taken as a whole can support the commission's findings for UK and Japan. But the court was unambiguous, though, at least, when the court said that it did not think it was coercing a particular result. No, and I think... That the court felt that it was a remand with an opportunity for the commission to explain itself. Yes. There's no question that the court felt it hadn't compelled us to enter a negative at that point. But I think it's very clear from the court's decisions in NSK-5 and NSK-6, Judge O'Malley, that the court's belief that it hadn't compelled us was premised explicitly on the idea that we had the opportunity to reopen the record to seek additional data to support our affirmative findings for UK and Japan. Now, the court never said in NSK-5 and NSK-6, when it's explaining the scope of its remand instructions in NSK-4 and NSK-5, that it had given us carte blanche to provide a further explanation of everything in the record without reopening the record. This is one of the problems I always have with substantial evidence review. I mean, are you supposed to just look and see if there were seven things cited in support of something? Or is the question really whether, in light of the entirety of the record, is the evidence sufficiently substantial? And it seemed that the trial court here was simply saying, there's a lot of evidence that you didn't consider. So yes, you've considered some evidence, and yes, you've pointed to some things, but what about all this other stuff? And I think the court was simply trying to say, respond to that evidence. Just give me an explanation for why it's not relevant. Well, I think I disagree with that, Your Honor, respectfully, which is when we get a remand from the court, we have to actually decide what the court's telling us to do with its explicit and clear language. And here in NSK-4 and NSK-5, it seemed to us pretty clear that the court said that the only thing you can do here in order to move forward and get an affirmative is to reopen the record and obtain additional data in order to support that. And I think if you look at the decisions in NSK-5 and NSK-6, where the court was explaining what it intended to do with its instructions in NSK-4 and NSK-5, the court made very clear that it was limiting our options on remand. By limiting our options on remand, it was telling us and telling you, I think, that she didn't intend to give us the typical remand instruction of, please go back, take a look at the other information in the record that I think is out there and I may or may not have pointed to in my opinions in NSK-4 and NSK-5. She actually said that this evidence that you provided to me, which you provided extensive data, extensive explanation, is not sufficient to find U.K. discernible, and it's not sufficient to find the accumulated imports with Japan that would be likely to cause injury to the industry. Was there evidence out there that the Court of International Trade, I mean, if indeed we are to read this as their intent only being that the Commission had the option of, what other evidence, I mean, is there anything that anybody can point to that would have been necessary to look at that wasn't already in the record? Well, that was part of our issue, Your Honor. When we looked at the court's instructions, there were two issues there. The first was that the court itself didn't tell us in any specific way what types of information it thought we should gather further on remand if we reopened the record. It was typically in a case when we reopened the record, there'll either be a fairly clear indication from the court that it thinks one aspect of our analysis and record is incomplete and we should reopen. The court generally says, I'm leaving it to your discretion because it knows it has to These are the issues where you don't have good data and you should look for further data. The problem for us with the court's instructions in NSK-4 and NSK-5 wasn't simply that the lower court... But that helps the other side, right? What I'm asking you about helps the other side, right? In terms of you. Because that suggests that she didn't. If she had told you, if the CIT had told the Commission to go reopen the record, then there'd be a substantial evidence. Well, no. The issue is that the way the court's instructions were framed is that the record as it currently exists, taken as a whole, and that's what the court said in NSK-4 and 5, and then it later said in NSK-5 and NSK-6, that the record as currently constituted, that's the whole record, cannot support your findings for UK, discernible, and Japan. Her discussion of this was clear, that she felt that the record as a whole could not support her findings. Right, but isn't that because what she believed is that in the record as a whole, there were a number of important factors that you had no data on and no data to address, such as the tri-type nature of the industry. No, actually, that's what's interesting about that, Your Honor. I'm glad you brought that up. Because the issue... Welcome. Sorry. The issue here is that we had, and what we said to the court when we told the court when we chose not to reopen the record, is that we felt that this record was as complete a record and data set as you will see in a Sunset Review. We had a very good record. We had actually obtained information on the tri-partite competition between non-subject subjects and the domestic product. We had reopened the record in the first remand process to obtain specific data on foreign capacity production shipments, and we had gotten pretty good data on pricing vis-a-vis for the non-subjects, vis-a-vis subject imports and domestic products in the market. So when you point to the tri-partite competition, and then you look at the analysis we conducted of tri-partite competition, both in the first remand and the second remand, you'll see that we had plenty of data, ample data, to perform the analysis that she was looking for. And the difference, as you know from our briefs, the difference here is that we disagree that we didn't address the idea of tri-partite competition in the market. We conducted a 17- to 18-page discussion of all of the facts that showed that non-subjects and subject imports and the domestic products were all well-suited to be competing with each other. They were substitutable. They were competing across the market in all end-use sectors of the market. The existing record data for the period of investigation, for the period of review in the second period, combined with the record data from the period of investigation from the original investigation, all showed that the subjects, the non-subjects, and the domestics were going to be competing with each other aggressively on price, and especially the subjects were going to be able to come into the market. How do you respond to your friends on the other side make the argument that in connection with the petition as it related to Chinese imports, that the Commission made some pretty specific findings about who was taking market from whom and about price elasticity of demand and that those findings are really contrary to the ones that you're making here? No, I think that they're not contrary at all. What happened in that situation is the Chinese imports investigation focused just solely on China. At that point, during the investigation period for that record, the investigation showed that Chinese actually at that point had a very modest amount of the market. There wasn't evidence of actual price suppressing effect at that point in time from the Chinese imports compared to the other imports in the market, which include the subject imports here, and that there hadn't been an obvious impact on the industry. You've got a situation where you're looking at a slightly different import set, different data, showing different price effects and price impact for that particular country during the period of investigation. You're comparing that and saying from that, what they're doing is they're looking and saying from that decision, because you're looking at a different country and a different specific set of period, a different data set of period, which we're looking at for the data, and that that data shows a very different set of trends for price and volume, you're comparing that to this situation and say that therefore there might not be injurious impact from an entirely different data set of imports, different countries, different price effects, different pricing data, different market share data. So the commission explained in its decision, there's a footnote that we refer to in our brief, very clearly why we thought the Chinese decision wasn't binding, was not controlling here, and as a matter of fact, was, as we always say in these cases, sui generis. Let's hear from Mr. Stewart, and you have your rebuttal, we'll save the rest of our questions for then. I think Mr. Stewart's going to come up on rebuttal. Oh, all right. One question before he sits down. Okay. Sure. Sure. There's a lot in this case, and for 30 minutes, but the order's been lifted, right? No, not really. What's happened is suspension is on. The order will only, the order and the dumping duties are no longer in place, but the entries of the import that are still subject, merchandise, are subject to suspension of liquidation. And the reason for that is that should you make the decision we would like you to make, which we think is the right decision, that will preserve Mr. Stewart and his client's abilities to recover dumping duties from the import. Okay, so it's those entries that haven't been liquidated that are still at issue? That's right. They haven't been liquidated. But it would be the Commission's position that if we were to reverse that the orders would go back on? Yes, that's exactly what would happen. Was there a 2010 review? Because the orders were still on as of 2010, right? I actually don't know that. I think you can ask Mr. Stewart that, but I know that if the orders were in effect, I believe that the orders were revoked in... I don't want to say something that's not true. There should have been ongoing... About a year ago. ...up until the point where the orders were revoked and the suspension remained in place. That's correct. But after that I'm not sure if they're going on. So the 2010 review did happen or didn't? I just don't know. Okay. I think Mr. Stewart. Okay. I'll ask him when he... Okay. Thank you. Mr. Phillips? Good morning, Your Honors. May it please the Court, Carter Phillips for the Japanese subject producers. Judge O'Malley, let me answer your question. There was a 2010 review for the non-Japanese, non-UK producers, and the orders were allowed to sunset with respect to the European producers, and there's been no review sought of that. So as a practical matter going forward, the other European producers are now non-subject producers as opposed to subject producers. Because there's nothing to accumulate them with, right? Right. Okay. So there's obviously a moving target. The market here changes dramatically. So there's a bit of surrealism in analyzing this market as of 2005, but it's unfortunately the nature of the beast that we deal with. Judge Prost, I want to start with a question of whether this should be abuse of discretion or clearly erroneous, and I think actually Judge O'Malley put her finger on it when she said, the judge here I think is as clear as humanly possible, has consistently said, look I just want you to explain it in a way that I can connect the dots and understand what it is that primarily Chinese, but all of the non-subject producers. Yeah, but that same judge also said in four, the Court does not believe the existing record ticket as a whole can support the affirmative discernible adverse impact findings in NSK-5. She says the record cannot support an affirmative finding of material injury. That's what this judge has said. That's what the judge, but the judge also said at the beginning of that same opinion, with its most recent conclusion, the commission has declined to provide a genuine discussion on complex issues of law and has thus foreclosed the opportunity for meaningful judicial review of the latest agency action. That's on page 17 of the joint appendix. It still seems, and everything she said. Why did your lawyer argue to the commission when it went back that it was based on the CIT decision, the commission must conclude that the revocation, blah, blah, blah, would not likely do it? Isn't that the spin that your lawyers put on this when you were back at the commission? Yeah, that was the spin we put on it, but I don't think Judge Barzilay bought that. I don't think that was her perspective at all. And indeed, you asked the question, what evidence was in this record that could have been evaluated? I don't think you have to look any further than pages nine and 10 of Temkin's brief in this case where they go through a great deal of analysis of whether the market operates with only two competitors and how that works out. Unfortunately, Temkin didn't bother to put that analysis before the commission and the commission didn't bother to try to analyze it to see whether that would have in fact connected the dots. Was it really not before the commission or is it just that the commission didn't happen to mention it? Was it in the record? It was in the record. Temkin argues that it was in the record. Well, the underlying data are in the record. The way Temkin put it together, and again, because they didn't put it together that way and make a presentation to the commission and the commission didn't analyze it, we never had a full opportunity, obviously, to respond to it. But what it does show is that there is plenty of evidence in this record from which the commission, if it had bothered to go through that process, could have in fact tried to connect the dots in a way that I suspect ultimately would have been upheld by Judge Barzilay. But the judge wasn't very specific about what she wanted. She just kept saying, go back and try again. I mean, why isn't there a clearer record from the trial court saying, these facts need more data to rebut them, or these implications need more data to rebut them? She didn't say it that way, though, did she? Not exactly that way, but I think there are sort of two responses to that. One is in the very first order that she issued saying, you didn't take China into account at all. She didn't say, and this is what you need to do in order to accomplish that. The commission went back on its own, reopened the record, and brought in a whole bunch of data that dealt specifically with this problem. Now, as it turns out, those data basically demonstrated that China was in an extraordinary position vis-a-vis the rest of the market on pricing. But what she did is the same thing there that she's done all the rest of the way through. But the second point, and I think this really is something that the commission could have figured out, which what she was complaining about is the commission's consistent reliance exclusively on the fact that the subject producers maintain some market share. And, in fact, that increased the market share. But what she wanted, at least I think the clear inference is, analyze those data and explain to me that that's because the subject producers are underselling the non-subject producers and are winning. Or is there some other explanation? On this record, I can't tell. So go look at that situation. Because the truth is, if that's a place where we're consistently beating the non-subject producers and beating them on price, that will suggest that the domestics are going to lose. And, therefore, that would fill in the blanks. Is it not fair, reading the record in its entirety, to conclude there was just a fundamental difference in the perception and the way the CIT analyzed the facts and the way the ITC was analyzing the facts. Facts. The facts being the impact that a large share by the non-subject users was having on all of this. I mean, the CIT says if the producers lower their imports, then the non-subject producers almost certainly will drop their prices. As a result, the non-subject imports likely would negate any potential significant adverse impact of the lower-priced imports. And the ITC clearly just thought another way. And they relied on significant evidence in the record as to what had been the impact of the competition between the non-subject and subject imports thus far. Isn't that just really what's the case? Well, I don't think that's a fair reading. I mean, at the end of the day, you're right. What the commission owed to the court was some analysis of where the subject importers are underpricing the non-subject importers and winning market share. What the commission, in fact, put forward, it said, yeah, there are a lot of situations, 10% of the situations where we can compare the prices, the subject importers, in fact, are below non-subject importers. But not all of the non-subject importers. And only two out of more than 100 and some price comparisons that would have fallen within that range. Only twice did the subject importers underprice all of the non-subject importers. I thought in the Timpkins brief says it was 40 out of, what, 140 or something. Right. But the key to that is the semantics. In 40 situations, it is true. The subject importers underpriced some non-subject importers. But only in two instances did we underprice all non-subject importers. So if you accept the commission's own view of the world. They can only look at those instances in which there was actual competition for the purchase. Right. I mean, they can't say, well, you underpriced these non-subject importers in this instance. But someone else might have been out here offering somebody else a lower price. Right. We've got to look at the actual transaction. Exactly. And these aren't transaction-by-transaction analysis. Unfortunately, these come in aggregations by the quarter. And I agree with you. That's exactly what they should have done. They should have looked at these things on a transaction-by-transaction basis to find out. Or to analyze it the way Timpkin analyzes on page 9 and 10. Say there are a lot of situations out there where they, in fact, compete. And they compete directly. And the subject importers win. I mean, at the end of the day, it's pretty important to recognize. This is a very anti-consumer statute. Okay. And I understand if you're trying to protect true domestic production, that outweighs that. But if all the commission has effectively done here is injure the consumers for the benefit of non-subject producers and importers, that clearly is not what this statute is designed to accomplish. But that's what Judge Barzilai believed the commission was allowing to happen, unless the commission could show in a concrete way the opposite to be true. She was within her exercise of discretion to make that point. Well, the underlying economic assumptions for the entire exercise that we're going through are that consumers will not necessarily have free open supply and free price competition. Of course. That's a given, right? Right. But normally, and frankly, it's the way the commission analyzed this case for the most part, which is you're dealing with sort of two-party fights. And there's no 800-pound gorilla out there who's a third party that's not subject to any regulation under these circumstances. In two-party fights, it's pretty easy to do exactly what the commission did. Do you have incentives? Do you have capacity? All that stuff works out. All of those findings would have been fine in that world if they would have segmented the market to analyze. What's happened in the past year? Has there been a diversion of capacity for these? My understanding is that things have not changed dramatically at all in the past year, not surprisingly. I mean, look, the reality is that the market shifts. I mean, people get purchased, there's a consolidation in the business, and obviously the economy is not exactly cranking away. I mean, the commission may have a better insight into exactly what's happening. But my understanding is nothing significant has changed over those times. The Court has no— I mean, I know it's not in the record, but I can't help but wonder. No, that's why I say it's a little frustrating to deal with 2005 when we're in 2012. But it is the nature of the beast. Thank you, Mr. Phillips. Thank you, Your Honor. Mr. Lipstein? Good morning, Your Honors. May it please the Court. Robert Lipstein for the NSK Group Companies. I'm going to focus primarily on the issue of the accumulation of U.K. imports, and in particular the commission's original decision that the U.K. imports would have a discernible and adverse impact on the U.S. market if this U.K. order were to be revoked. From NSK 1, the CIT was saying to the commission, please analyze that question in the context of the fact that non-subject imports are a substantial and growing presence in the U.S. market. U.K. imports were the smallest by value of the total of all the subject imports. So please take another look at that question. The commission did that on its first remand, came back to the court in NSK 3. Judge Barsley again said, I'm sorry, but you didn't answer the question that I asked, which is what is it about the U.S. market in light of all of these non-subject imports? The accumulation, the threshold test for accumulation is a very low showing, isn't it? It is a low showing, but as the Court said below, it's not a non-existent showing. Well, the commission made some very specific findings about the U.K. being more interested in being an exporter than an importer and that there was some capacity that was available. I mean, they made findings. The commission did indeed make certain findings about the nature of the U.K. industry, which were accepted in NSK 1, that it is export oriented. But what the Court said in NSK 4 was export oriented, but where? And the record showed the export orientation was to Europe and to other countries, not to the United States. Was that partially because of the existence of the order, though? Well, the record data also showed that the U.K. industry had been substantially restructured during this time period, that there was a very, very significant decline in capacity in the U.K., that there was a very sharp increase in capacity utilization in the U.K., and an increasing shift in focus towards European customers. So the U.S. market was not the focus of the U.K. producers. That had nothing at all to do with the order being in place or not, coupled with the fact that the non-subject imports had become a substantial presence in the U.S. market. So the judge by NSK 4 asked the question to the Commission, where is the incentive to draw any additional U.K. production to the U.S. market? The fact that the U.S. market is higher priced, right? The pricing data for the U.K. product, the judge had already ruled in NSK 1, was not a usable data set. The Commission tried that. The court below said, I've already rejected that once. You can't rely on that as a basis for inferring that additional U.K. product would come to the U.S. market. What are you saying should have been done differently for the U.K. market? Well, so what the Commission ultimately did on the third remand was to not accumulate the U.K. imports and find that the U.K. imports would not injure the domestic industry and revoke the U.K. order. We believe that's the correct decision. That's the decision that the court below affirmed. All right. I wondered whether you were defending. Okay. Thank you. Thank you. Mr. Schutz. Good morning. May it please the court, Andy Schutz for Shuffler Group Companies, Cross Appellants. We are challenging the trial court's denial of jurisdiction over Shuffler's entries from Germany and Italy. Is this only a live issue if we don't reverse? It is a live issue because there are still entries of – But if we would reverse – Oh, I'm sorry. Is this no longer an issue before – That's correct. You're gone. That's correct. That's correct. Sorry. NSK Corporation is a U.S. ball bearing producer. As a U.S. ball bearing producer, they were a party to proceedings as to all orders that were accumulated in this case. Therefore, they had standing to challenge each of those orders. Just because that they had a Japanese affiliate that was included in their appeal does not automatically mean that their appeal was limited to the Japan order only. In fact, if you look at their complaint, their complaint only contains general references to the ITC determination as a whole, and it doesn't contain any country specific – But you have to look at who they filed it on behalf of. I mean, there were two requests, one on behalf of Japan and one on behalf of UK. I mean, you could have filed a request, right? Yeah, you're right. We could have filed a request, but if you look at each of those complaints, the UK complaint specifically has a country specific count regarding decumulation. It would therefore make sense for them to file a specific complaint for UK only and for a complaint, a second complaint for the remaining countries that were accumulated. Isn't this just really an effort to tag on to somebody else's successful arguments before the court? I mean, it's a jurisdictional question. It is a jurisdictional question. You didn't file a petition. You did not participate until after the action was already filed. But the statute provides intervention as a right, and it provides an independent basis to challenge. Well, you could certainly intervene for purposes of making arguments that would support the relief that was sought, but you can't intervene and seek some different kind of relief, can you? And that's not what in fact happened. The trial court in fact found that even if it had granted our request of enjoining the injunction, that the case would not be enlarged at all. And it wouldn't be enlarged at all because as accumulated case proceeds below, the entire case proceeds as a single proceeding in all intents and purposes. The data is a single set of data. The arguments that countries make, that companies make is non-review specific, and most importantly, the injury determination is applied equally to each of those orders. So it's your position that any time the ISTC uses accumulated data, that every party that's in that accumulation is automatically entitled to the relief sought even if they've never filed any kind of petition or claim? Well, we have two positions. The first is you don't need to make that claim here because each of these parties, NSK Corporation and us, were parties to the proceeding and had standing to challenge each of those orders. So if they had standing to challenge it, they then – if they had standing to challenge it, they didn't. But if you look at the complaint, that's unclear. Now, after briefing, after the trial court made its decision on the preliminary injunction, after briefing, it became more clear that NSK was potentially challenging only the Japan order. But at the time of Sheffler's intervention, it was a reasonable interpretation of NSK's pleadings that they were challenging the entire order or all orders accumulated. In fact, they're no different than – if Timken had challenged this case and had a similarly general complaint like NSK did, there would be no question that Timken would be challenging the ITC's determination as to all orders accumulated. This is, in fact, no different. And even if you don't make the determination, even if the trial court didn't have jurisdiction in this case, the ITC still should have exercised its inherent authority to apply its new injury determination to these other three orders. Because if its new determination was based – But that's a whole different issue. That issue was never raised in the lower court. It was raised. We raised that issue. Did you go back to the ITC and ask them? Yes, we did. To exercise their inherent authority to expand the scope of the relief? Yes, we absolutely did. And then did you file an appeal to the trial court from that? We filed a remand comment to the court, and the court denied that in its last opinion. Okay. Any more questions? Any more questions? Okay. Thank you. Okay, thank you very much. Okay. Good morning. It's a pleasure to be here. Let me quickly try to address Judge O'Malley's question about what happens if you were to reverse the decision. The orders would be put back into place. There would be a new sunset review that would get started if parties chose to do so. If there was no sunset review pursued at that point in time, there would be a revocation from whatever the effective date should have been if the sunset review had occurred in a normal timeframe. So there is no 2010 sunset review that's issued? It would be that 2010 sunset review started, and it would have an effective date back to whenever the 2010 sunset review should have occurred. But at this point, it could not include the other European countries? Well, the European countries were revoked from the 2010 date, but what you have tied up in the courts are all the entries from 2005 to 2010. Okay, but there's no appeal from that revocation? There's been no appeal from that revocation. That's correct. The distinction with regard to standard of review, every time abuse of discretion has been applied to an interlocutory decision of a trial court, you have done substantial evidence on the later decision. Here you have decisions under protest. There was no case before this court, there have been four, where the court has reviewed a decision under protest for substantial evidence. And it's always looked at the underlying decision on substantial evidence. It was interesting to hear my colleague… So the ITC can dictate our standard of review by just calling it a decision under protest? I'm not saying that, but the question is, what decision would you be reviewing for substantial evidence? When one has looked at interlocutory decisions, one has decided, do we address that on the merits, or do we address it in terms of abuse of discretion in terms of the remand itself? With regard to the information that Mr. Phillips referred to that we had submitted in our brief, it was submitted during the context of the remands. The commission indicated that all of that information strongly supported what they had already found, but they felt that they could not address it. We had asked the trial court to consider remanding the case to the ITC so that they could consider those things that Mr. Phillips said were so convincing, and that obviously would have been helpful to the court in doing that. So one option for the court, if you view this as a major stumbling block, would be to remand with instructions, to remand it to the commission to permit them to examine the issues that the commission felt they could not examine. Finally, one of the impenetrable barrier issues that was in the staff report of the commission from the very beginning, pricing is very important in bearings, but there are thousands and thousands of bearing numbers. If you look at the Joint Appendix public page 1162, you will see how purchasers viewed the most important issues. Pricing is the second most important issue. The first most important issue was quality. Footnote 4 says, when asked how often they purchased the ball bearings offered from the lowest price to them at the lowest price, no purchasers said always. 14 said usually, 22 said sometimes, and 14 said never. The reason that the data on 9 and 10, why there's a segmentation in the market where there is competition only between subject and domestic for certain types of customers, is exactly the quality issue where price... So all of your argument here goes to the fact that we shouldn't have looked at the non-subject, that the ITC shouldn't have looked or emphasized the non-subject? The ITC did an extensive evaluation of non-subject, but the pricing information that is being talked about is so persuasive that non-subjects would destroy the subject imports if you took off the order. The only thing that changes with a revocation is the removal of the order, right? And so there's no reason that non-subjects would be more incentivized, but you have... Because there are thousands of bearings, the commission sends out questionnaires that ask for pricing on 10 part numbers, 10 out of thousands. And so the coverage, as you would expect, would be quite small. The coverage as reported in the ITC staff report for this review on the subjects was somewhere between a half percent for domestic producers and I think two percent... If you're just looking at the questionnaires, the data set that the commission was working from was pretty weak, wasn't it? Well, it's a question in terms of what the commission can do if you have 100 involved bearings or more than 100,000 part numbers. So there's the question, how much data can you go out and collect when the purchasers and the importers all identified subject imports as being significantly below domestic producers in many cases? And that is also in the staff report. There's a table that shows whether they view domestic as higher or lower, and virtually all of the purchasers identified the subject imports as below domestic. They also identified non-subject as below domestic. So there's lots of information from the commission. There's a question of what can a commission do in a normal investigation. They did an enormous amount in this case. There's a tremendous amount of information, not only from what the commission identified, but what the domestic parties and the importers and the purchasers also clearly stated against interest from the part of importers and purchasers. You've got purchasers saying, we will buy more product from subject countries if you take these orders off. Prices will go down. Before you sit down, I want to go back to your issue about remand. I don't really understand how we could do that at this point. You're saying that one of the options we would have is to remand to the commission to undertake the very analysis the commission already refused to undertake? Based on their construction of what they believed the court had told them to do. They were trying to honor the CIT's remand instructions to them. They felt that they were bound to change their decision since they did not believe that what they'd been asked to do was to reconsider or provide more explanation. What they did say in their decision, we agree with all these things that Timken has said, and they are more support for the position we've already taken. But we don't read the court's remand as letting us put that forward. Right now, the judgment that's in front of us is the court affirming the negative findings, right? Negative decision under protest, that's right. Okay. Any more questions? Thank you. You wanted the last word? It's only if you... We can have a minute to wrap up. Let me do it quick. Just to follow up on what Mr. Stewart was saying, Judge O'Malley. We entered that negative decision under protest primarily because we read the court's orders as constricting us from actually responding further with explanation because we hadn't reopened the record. If you feel like we misinterpreted that, and certainly that negative determination, which has no analysis or support behind it, you could theoretically, as I think a less good alternative, remand it back to the court and give us an opportunity to provide further explanation if the court was, in fact, telling us that we should do that. But that is not what the court was saying. And to follow up on that, I just want to point out that it's really important to look at NSK-5 and NSK-6. Because in NSK-5 and NSK-6, the court explained what it was doing with respect to its two-option remand, the way we look at it. It said very clearly, the court may have limited the commission's options on remand. Then it says, quote, with quotes approvingly from the new court decision, even though reviewing court's decision that substantial evidence does not support a particular finding may have the practical effect of dictating a particular outcome. So in her view, she was limiting our options to reopening the record if we wanted to go affirm it again. And the fact is, if we didn't do that, she believed that that was going to dictate the particular outcome we entered, which is the negative determination under protest. So I think it's important to really take that into account. It's not just our view of what the court was saying. It's what the court itself was describing its instructions as being. A quick, if I can beg the court's indulgence, quick point. Mr. Lipstein said our findings about attractiveness of pricing in the U.S. market were invalid because the court found that the U.K. pricing data was limited and couldn't be relied on. Those two things are very different data sets. We weren't looking at the U.K. underselling data to assess the attractiveness of pricing. We were looking at testimony from purchasers and other people in the market, entirely different, who reported that U.S. pricing was more attractive at that time in the U.S. market than other export prices. The two data sets had no relationship to each other. And then finally, Judge Prost, I think you're right. Fundamentally, at the core of this issue, after two remands, after an original determination, after lengthy analysis, what happened between the Commission and the court is that we just disagreed on the weight of the evidence. And as you know, the idea here in the Substantial Evidence Review is the court shouldn't be telling us that we have to enter a negative decision or an affirmative decision with which we disagree simply because it believes the evidence should be weighed a different way. If you look at what we did in the first and second remands, and you come to the conclusion that we did an incredibly comprehensive, exhaustive, fact-filled job of explaining all the issues the court raised, then I think we need to be affirmed here, and you need to reverse and vacate the court's decisions in 4, 5, and 6. Thank you. Thank you. Thank you all. The case is taken into submission.